UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  2011-

_____

| | |
|---|---|
| MICHAEL P. MAGUIRE and CHRISTINE WARNER, | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| FOUR SEASONS HOTELS AND RESORTS | ) ) ) |
| and | ) ) |
| PLAYA PRIETA BEACH CLUB As it is Owned by ALTURUS DE PRIETA, S.A., | ) ) ) ) |
| Defendants | ) |

COMPLAINT AND JURY DEMAND

_____

PARTIES

1.     Plaintiffs, Michael P. Maguire and Christine Warner are a married couple , (the "Plaintiff" or "Mr. Maguire") residing at 10 Hovey's Pond Road, Boxford, Essex County, MA 01921.

2.     Defendant, Four Seasons Hotels and Resorts ( the "Defendant 4 S") , is a corporation organized and existing under the laws of Canada with a principal place of business at 1165 Leslie Street, Toronto, Ontario, Canada M3C 2K8 and is doing business in Massachusetts with a registered agent located at CT Corporation, 101 Federal Street, Boston 02110, Suffolk County, MA.

3.     Defendant Playa Prieta Beach Club is owned by Alturas de Prieta, S.A., with a principal place of business at Carrion Multiplaza 250 Meters South, Terraforte

Building, Third Floor, Escazu, San Jose, Costa Rica and doing business as the Playa
Prieta Beach Club (the "Defendant Beach Club") at Peninsula Papagayo.

JURISDICTION

4.      This action is based on diversity jurisdiction 28 U.S.C. §1332.

FACTS

5.      The Defendant  4 S, at all times mentioned below was engaged in the
operation and management of a hotel and resort, and/or was engaged in the business
of providing a variety of activities and locations for its guests to enjoy the local
environment while visiting the Four Seasons Resort in Costa Rica at Peninsula
Papagayo.

6.      The Defendants, Four Seasons and the Beach Club were engaged in
providing 4 S guests with the option of using the pool facilities located at the Beach
Club at all times mentioned below during Mr. Maguire's stay at the Four Seasons in
Cost Rica.

7.      For more than twenty (20) years , Mr. Maguire has been a loyal patron of
the Four Seasons whenever he was able to utilize its services.  He has remained loyal to
the Four Seasons because it has always fulfilled its representation to provide the very
best in all phases of resort accommodations.

8.      As a result of Mr. Maguire's premier experiences at numerous and various
Four Seasons locations, in October, 2009 he was looking forward to his vacation at the
Costa Rica Four Seasons where he was to be a guest for a week along with his wife and
several other colleagues.

9.      On the first full day of his arrival, Mr. Maguire decided to utilize the pool
facilities where he could swim laps and maintain his conditioning for cycling year
round.  He was informed that he could take advantage of the hotels services that
included a drop-off and pick-up at the Beach Club and while at the Beach Club he could

use his Four Seasons account to purchase any items he might require, including beverages and meals.

10.     Mr. Maguire and his wife, Chris, arrived at the Beach Club at approximately 10:30 on October 9, 2009, and were the only people there, except for the pool attendant.  Mr. Maguire did a warm-up swim and then left the pool to use the men's room before starting his actual workout.  As Mr. Maguire exited the pool there were non-skid, textured, non-slip tiles around the pool deck and he proceeded to approach the men's room where he stepped unknowingly into a puddle of standing water.  There were no signs or any other indication that there was water or a change in the surface of the tiles—in this area the tiles were no longer textured, non-skid tiles and they were wet.  As Mr. Maguire walked toward the men's room his left leg slipped out from under him and he fell backwards with his right leg underneath his body.  He heard a terrible snapping explosive noise, and felt a horrible pain and believes he passed out.

11.     The next thing Mr. Maguire recalls is coming to on the ground with extreme pain in his shoulders, and his elbows.  The pain he experienced was excruciating, he tried to get up and could not move his leg.  When he looked down at his right leg he could not see the knee or the kneecap, but to the right there was a large swollen mass.  The wind had been knocked out of Mr. Maguire and he was unable to even yell to his wife ---- after about ten minutes he tried to gather himself together.  He knew his wife was in the pool and at that point the attendant was not in the area.  Eventually, an employee walked by and Mr. Maguire asked him to get some help because he could not get up and he wanted to get to a chair.  The employee went to find the pool attendant.  At about the same time, his wife saw Mr. Maguire and went to him, as soon as she saw what had been his knee, she began calling for help.

12.     The General Manager of the Beach Club arrived with the pool attendant and tried to minimize the situation by offering Mr. Maguire a complimentary cocktail

several times, which Mr. Maguire declined an equal number of times.  After repeated requests that a paramedic be called, the Beach Club called the General Manager at the Four Seasons Hotel and he asked if Mr. Maguire wanted to return to the hotel.  Mr. Maguire informed him that he needed to go to a hospital.  The Beach Club General Manager went and called the Four Seasons again and returned and informed Mr. Maguire that they would be sending the Four Seasons' medical doctor to the Beach Club.

13.     Mr. Maguire and his wife were very upset at this point and insisted that the paramedics be contacted immediately to transport Mr. Maguire to the hospital, more than an hour away.  After several attempts to assist Mr. Maguire to an upright position, the paramedics were able to stabilize his leg in an inflatable cast and he was seated in a chair. At this point, the paramedics were getting ready to put Mr. Maguire in the ambulance when the Four Seasons called and demanded that the paramedics transport Mr. Maguire back to the Four Seasons for its' medical doctor to see him.  Mr. Maguire was upset with this delay since it was in the opposite direction of the hospital and he was in increasing pain.

14.     By the time the ambulance arrived at the Four Seasons Hotel, Mr. Maguire had been suffering with his injuries for more than two hours.  The Four Seasons' doctor entered the ambulance and proceeded to inquire as to how much pain Mr. Maguire was in, how bad it was, and he was asked multiple times by the doctor what he had been drinking and how much-----despite Mr. Maguire's repeated assertions that he did not consume alcohol.

15.     The Four Seasons' doctor proceeded to take Mr. Maguire's medical history and once that was completed, another member of the Four Season's staff (translator/medical assistant/doctor?) was sent with Mr. Maguire in the ambulance to the hospital. When Mr. Maguire arrived at the hospital, the radiologist asked why they were there since when he had spoken with the Four Season's doctor, he had told him to

wait until the hospital called because there had been a serious accident and there was only one orthopedic doctor in Liberia and he was tied up in surgery with other patients.

16.     After a long wait in a makeshift reception room that looked more like a storage room, the radiologist arrived and instructed that Mr. Maguire have x-rays taken.  The technician was completely oblivious to the pain Mr. Maguire was in and caused him additional pain by lifting his leg, then dropping it --- evidently he thought the injury was a dislocated knee.  Mr. Maguire's wife was able to assist him to the examination table, pictures were taken and the inflatable cast was put back on.

17.     About an hour later the radiologist returned and did an ultrasound.  She informed Mr. Maguire that there was a stage 4 rupture of the quadriceps tendon, which means that it has been torn off the knee and would require immediate surgery to repair it.   The orthopedic surgeon arrived and reviewed the ultrasound and x-rays and reached the same conclusion.

18.     Meanwhile, the so-called "translator/medical assistant/doctor" from the Four Seasons Hotel was nowhere to be seen, but was overheard speaking on the telephone explaining what was happening to someone, it is believed upon information and belief, at the Four Seasons.  Mr. Maguire was informed that the doctors there would do the surgery for between $7,000.00 and $8,000.00, less than a third of the cost of having it done in the U.S.  Despite the bargain price, Mr. Maguire declined the offer since he could see the unsanitary conditions surrounding him in the clinic.

19.     Mr. Maguire asked that he be prepared to return to the U.S. for treatment, and that his leg and condition be stabilized for the trip.  In order to do so, he was put in a hard cast, from hip to ankle.  This was done despite Mr. Maguire's history of strokes and brain by-pass surgery, for someone such as Mr. Maguire putting on a hard cast for travel can cause blood clots to form, thereby increasing the likelihood of other medical issues.  Once again the Four Seasons "translator/medical assistant/doctor" did nothing to facilitate Mr. Maguire's return to the hotel.

20.     After the hard cast was put on, Mr. Maguire had to wait more than an hour with his wife for someone from the Four Seasons Hotel to pick them up and return them to the hotel.  It was late evening before they were transported back to the hotel. At all relevant times, Mr. Maguire's wife, Christine was with him.  She witnessed his excruciating pain after his fall and the entire set of events that occurred after his injury and transport back to the Four Seasons and to the clinic and back to the Four Seasons.

21.     Upon their arrival at the Four Seasons Hotel the General Manager informed them he had provided a bottle of red and white wine.  It was declined and he then offered complimentary dinner from room service.

22.     The next morning, Saturday, October 10, 2009, two matters were addressed.  First, when Mr. Maguire's wife returned to the pool to locate some forgotten items, she saw that there were signs at every puddle of water warning that water was accumulated, the signs had not been present on the previous morning.  Second, the Four Seasons Hotel staff had Mr. Maguire's prescriptions for pain medication filled, since the prescriptions could not be filled the day before.  The travel agency for the trip Mr. Maguire was on arranged for a first class flight home on Sunday, the earliest departure out of Liberia.

23.     Since Mr. Maguire arrived home on Monday, October 12, 2009, he could not receive medical care since it was a national holiday and he had to wait another day before he could see his orthopedic doctor --- the hard cast was removed and his surgery was booked for the first available date, that Friday, October 15, 2009.  Late on Friday, approximately 6:00 P.M. Mr. Maguire was operated on. He was in such pain he was not released and stayed until the next day when he was released.

24.     For the next month, Mr. Maguire was in severe pain and was on pain killers.  A week after the surgery he returned to his orthopedic doctor and was informed that the surgery had gone well but that it would be a long road back to recovery.  He had to wear a brace for almost a quarter of the year.

25.     On October 22, Mr. Maguire commenced physical therapy, his range of motion was about 25 degrees, he went five days a week for six weeks for an hour each visit.  In addition, he worked on his own seven days a week for an hour.

26.     Mr. Maguire sustained significant personal injury, suffered severe financial loss due to his inability to work and move about as he usually did and sustained more than approximately $ 75,000.00 in medical bills, costs, expenses and lost income due to his injuries.  In addition, his wife suffered from severe emotional distress and lost income due to the injury her husband sustained and she witnessed.

COUNT I

27.     The Plaintiff , Mr. Maguire, was a guest of the Four Seasons walking with his usual careful manner to the men's room at the Beach Club, represented to be one of the many amenities available to Four Seasons Hotel guests, when the wet tile he was walking on caused him to fall and severely injure himself in numerous places including a rupture to his right quadricep.

28.     The Defendant Four Seasons Hotel and Beach Club, at all times mentioned below was engaged in the operation and management of the Four Seasons Hotel and for all intents and purposes had a direct supervisory role at the Beach Club.  When the Plaintiff Mr. Maguire slipped and fell, the first call by the General Manager of the Beach Club was to the General Manager of the Four Seasons Hotel.  In fact, the Four Seasons Hotel provided round-trip shuttles to the Beach Club and any purchases of meals and/or drinks of Beach Club patrons was directly billed to the Four Seasons Hotel patrons account.  The General Manager took his instructions from the General Manager of the Four Seasons Hotel and, as directed by the Four Seasons Hotel Manager, had Mr. Maguire returned to the Four Seasons Hotel to be seen by its physician BEFORE Mr. Maguire was transported to the hospital in Liberia, more than an hour away.

29.     When Mr. Maguire slipped and fell on the tile that was wet and smooth, without any texture or non-slip, non-skid surface, he ruptured his right quadricep and injured his elbows and shoulders as well.  The smooth wet tile was not marked with a "Caution – Wet" notice of any kind until AFTER the accident when Mr. Maguire's wife returned to the location and saw the signs.  The failure to put up signs and warn guests of the Beach Club of the dangerous condition caused Mr. Maguire to fall and injure his shoulders/elbows and leg and sustain other bruising and pain when he fell on the wet tile at the Beach Club.  Mr. Maguire's fall and injuries he sustained were the direct and proximate result of Defendant's negligent operation and management of the Four Seasons Hotel and Beach Club which included, but was not limited to the following:

(a)     The Defendant negligently and carelessly failed to warn of a wet floor;

(b)     Defendant negligently failed to install a tactile tile floor so that a textured, non-skid, non-slip surface would prevent guests from falling and such failure thereby caused Mr. Maguire to fall and injure himself;

(c)     Defendants negligently failed to exercise reasonable care in the construction and management of the Beach Club and The Four Seasons Hotel should have known that such negligent and reckless failure to have tactile tiles on the entire floor area would greatly increase the risk to guests, including that Mr. Maguire could slip and fall on a wet smooth surface with no signage of "Wet" thereby causing him to suffer injuries; and

(d)     Defendants negligently failed to avoid a dangerous condition when they knew or in the exercise of reasonable care should have known that it existed.

30.     As a direct and proximate result of the negligence of the Defendants, as stated above, Mr. Maguire fell and sustained severe personal injuries causing him to be

hospitalized on two occasions.  First, in Liberia when he was transported to the hospital and later when he was operated on at home after returning as soon as possible to the Addison-Gilbert Hospital in Beverly where his orthopedic surgeon operated on his ruptured quadricep. To date, the medical bills, costs, expenses, and lost income exceed seventy five thousand dollars ($75,000.00).

WHEREFORE, Mr. Maguire demands judgment against Defendants in an amount which exceeds the jurisdictional requirements of this Court, plus interest and costs.

## COUNT II

31.     Paragraphs 1 through 30  are incorporated herein as if set forth in their entirety.

32.     As a direct and proximate result of the negligence of Defendants, as stated above, Mr. Maguire underwent extensive hospitalization and medical treatment, including surgery on his ruptured quadricep.  Further, he received physical therapy for the remainder of 2009 and the early part of 2010.  In addition, Mr. Maguire no longer has the range of motion that he had as a direct and proximate result of Defendant's negligence.

33.     As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and continues to suffer great physical pain and mental anguish, emotional distress and has incurred substantial expenses in an attempt to recover from his injuries.

WHEREFORE, Mr. Maguire demands judgment against Defendant in an amount which exceeds the jurisdictional requirements of this Court, plus interest and costs.

## COUNT III

34.     Paragraphs 1 through 33 are incorporated herein as if set forth in their entirety.

35.     As a direct and proximate result of Defendants' negligence, Mr. Maguire has been and will continue to be unable to perform many of his normal and daily activities. As a result of the accident, Mr. Maguire suffered severe pain to his leg, shoulders and elbows. Mr. Maguire's hobby includes cycling and the injuries he suffered dramatically impacted his ability to participate as he had in the past.  In addition, Mr. Maguire now has significant scarring and scars on his right leg from the surgery.  Following his release from the Addison-Gilbert Hospital, Mr. Maguire went to physical therapy for many months. Mr. Maguire has had great difficulty walking and moving about since the accident and suffered pain and limited mobility.  Mr. Maguire's medical bills, costs, expenses and lost income to date exceed $75,000.00.  Mr. Maguire is still unable to cycle the distance he once did without pain.  For several months after the accident he could not even cycle.

36.     As a direct and proximate result of Defendants negligence, Plaintiff has been and will continue to be unable to do the distance cycling he has enjoyed for most of his life.  He suffers from pain in his right leg, shoulders and elbows and has been told that he will likely suffer from arthritis in those joints injured in the accident.

<u>COUNT IV</u>

37.     Paragraphs 1 through 36  are incorporated herein as if set forth in their entirety.

38.     As a direct and proximate result of the negligence of Defendants, as stated above, Mr. Maguire's wife, Christine Warner was not able to enjoy her vacation with her husband in Costa Rica as they had planned.  At all relevant times, she witnessed the extreme pain her husband suffered and the poor response by all of those in positions of responsibility at the Four Seasons.  In addition, she was unable to work her usual schedule upon her return home because she had to provide care and support to her

husband during his convalescence.  Needless to say, Christine Warner and her husband were unable to engage in their usual recreational and social activities together for almost a year after the accident.

39.     As a direct and proximate result of Defendants' negligence, Plaintiff Christine Warner suffered emotional distress, the loss and companionship of her husband for almost a year  and as a result of the accident she has suffered a financial loss due to her inability to work her regular work schedule.

WHEREFORE, the Plaintiff demands judgment against Defendant on his Complaint for an amount sufficient to compensate him fully for his injuries, lost income, together with interest, attorneys' fees, and such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS  A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY A JURY IN THE WITHIN ACTION**.

MICHAEL MAGUIRE ET AL,
By their attorney,

_____
Ann L. Palmieri (BBO#388090)
Law Office of Ann L. Palmieri
65 Franklin Street, Suite 500
Boston, MA 02110-1303
(617) 482-6111

Dated:       August 11, 2011